Justice SCALIA, concurring in part and dissenting in part.
I join Justice THOMAS's opinion. I write separately to note that modern Restatements-such as the Restatement (Third) of Restitution and Unjust Enrichment (2010), which both opinions address in their discussions of the disgorgement remedy-are of questionable value, and must be used with caution. The object of the original Restatements was "to present an orderly statement of the general common law." Restatement of Conflict of Laws, Introduction, p. viii (1934). Over time, the Restatements' authors have abandoned the mission of describing the law, and have chosen instead to set forth their aspirations for what the law ought to be. Keyes, The Restatement (Second): Its Misleading Quality and a Proposal for Its Amelioration, 13 Pepp. L.Rev. 23, 24-25 (1985). Section 39 of the Third Restatement of Restitution and Unjust Enrichment is illustrative; as Justice THOMAS notes, post,at 1068 (opinion concurring in part and dissenting in part), it constitutes a " 'novel extension' " of the law that finds little if any support in case law. Restatement sections such as that should be given no weight whatever as to the current state of the law, and no more weight regarding what the law ought to be than the recommendations of any respected lawyer or scholar. And it cannot safely be assumed, without further inquiry, that a Restatement provision describes rather than revises current law.
Justice THOMAS, with whom Justice SCALIAand Justice ALITOjoin, and with whom THE CHIEF JUSTICE joins as to Part III, concurring in part and dissenting in part.
Kansas, Nebraska, and Colorado have presented us with what is, in essence, a contract dispute. In exercising our original jurisdiction in this case, we have a responsibility to act in accordance with the rule of law and with appropriate consideration for the sovereign interests of the States before us. I agree with the Court's conclusion that Nebraska knowingly, but *1065 not deliberately, breached the Republican River Compact, and I agree that there is no need to enter an injunction ordering Nebraska to comply with the Compact. But that is where my agreement ends. Applying ordinary principles of contract law to this dispute, I would neither order disgorgement nor reform the States' settlement agreement.
This Court once understood that "the hardship of the case ... is not sufficient to justify a court of equity to depart from all precedent and assume an unregulated power of administering abstract justice at the expense of well-settled principles." Heine v. Levee Comm'rs,19 Wall. 655, 658, 22 L.Ed. 223 (1874). Today, however, the majority disregards these limits. Invoking equitable powers, without equitable principles, the majority ignores the principles of contract law that we have traditionally applied to compact disputes between sovereign States. It authorizes an arbitrary award of disgorgement for breach of that contract. And, it invents a new theory of contract reformation to rewrite the agreed-upon terms of that contract. I respectfully dissent from these holdings.
I
A
The States in this action disagree about their rights and responsibilities under the Republican River Compact and their 2002 Final Settlement Stipulation (Settlement), and have asked this Court to resolve what is, in essence, a contract dispute. "An interstate compact, though provided for in the Constitution, and ratified by Congress, is nonetheless essentially a contract between the signatory States."Oklahoma v. New Mexico,501 U.S. 221, 242, 111 S.Ct. 2281, 115 L.Ed.2d 207 (1991)(Rehnquist, C.J., concurring in part and dissenting in part). Likewise, a legal settlement agreement is a contract. Kokkonen v. Guardian Life Ins. Co. of America,511 U.S. 375, 381-382, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).
The Court should therefore interpret the agreements at issue according to "the principles of contract law." Tarrant Regional Water Dist. v. Herrmann,569 U.S. ----, ----, 133 S.Ct. 2120, 2130, 186 L.Ed.2d 153 (2013). Under these principles, the Compact and Settlement are "legal document[s] that must be construed and applied in accordance with [their] terms." Texas v. New Mexico,482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987)(Texas III); see also Kaktovik v. Watt,689 F.2d 222, 230 (C.A.D.C.1982)(applying "familiar principles of contract law" to a settlement agreement").
That command is even stronger in the context of interstate compacts, which must be approved by Congress under the Compact Clause of the Constitution. Art. I, § 10, cl. 3; Alabama v. North Carolina,560 U.S. 330, 351-352, 130 S.Ct. 2295, 176 L.Ed.2d 1070 (2010). Because these compacts are both contracts and federal law, we must be more careful to adhere to their express terms, not less so. Ibid.If judges had the power to apply their own notions of fairness "to the implementation of federal statutes, [they] would be potent lawmakers indeed." Id.,at 352, 130 S.Ct. 2295.Thus, to the extent that we have departed from contract law principles when adjudicating disputes over water compacts, it has been to rejectloose equitable powers of the sort the majority now invokes. See, e.g., id.,at 351-353, 130 S.Ct. 2295(rejecting an implied duty of good faith and fair dealing in interstate compacts). We have repeatedly said that "we will not order relief inconsistent with the express terms of a compact, no matter what the equities of the circumstances might otherwise invite."
*1066 Id.,at 352, 130 S.Ct. 2295(internal quotation marks and alterations omitted).
B
Rather than apply "the principles of contract law," Tarrant Regional Water Dist., supra,at 1065, 133 S.Ct., at 2130, the majority calls upon broad equitable power. Ante,at 1051 - 1053. It evidently draws this power from its "inherent authority" to apportion interstate streams in the absence of an interstate water compact. Ante,at 1052. In the majority's view, States bargain for water rights "in the shadow of our equitable apportionment power," and thus we "may invoke equitable principles" to "devise fair ... solutions" to disputes between States about the bargains they struck. Ante,at 1052 - 1053 (internal quotation marks and alteration omitted).
That conclusion gets things backwards: As we have explained, once a compact is formed, "courts have no power to substitute their own notions of an equitable apportionment for the apportionment chosen by Congress" and the States. Texas v. New Mexico,462 U.S. 554, 568, 103 S.Ct. 2558, 77 L.Ed.2d 1 (1983)(Texas II) (internal quotation marks omitted).
The majority next asserts "still greater" equitable power by equating contract disputes between sovereign States with cases involving federal law and the public interest. Ante,at 1052 - 1053. Although the majority recognizes that it "may not order relief inconsistent with a compact's express terms," it claims enlarged powers "within those limits." Ante,at 1053 (internal quotation marks and alterations omitted). "When federal law is at issue and the public interest is involved," the majority says, the Court's equitable powers are "even broader and more flexible" than when it resolves a private-law dispute. Ibid.(internal quotation marks omitted).
But the precedents on which the majority relies to justify this power have nothing to do with water disputes between States. The majority cites Porter v. Warner Holding Co.,328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), which involved a suit by the Administrator of the Office of Price Administration for an injunction against a landlord who had charged too much rent in violation of the Emergency Price Control Act of 1942. In that case, the Court recognized a public interest in the Administrator's effort to "enforce compliance" with the Act, and "to give effect to its purposes." Id.,at 398, 400, 66 S.Ct. 1086. The Court reasoned that, "since the public interest is involved in a proceeding of this nature, [a district court's] equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." Id.,at 398, 66 S.Ct. 1086. The authority Portercited for this point was Virginian R. Co. v. Railway Employees,300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), a case on which the majority likewise relies. Ante,at 1053. But that case, like Porter,did not involve a state party or an interstate water dispute; instead, it concerned a dispute between private parties-a railroad and its employees' union-arising under the Railway Labor Act. Virginian R. Co., supra,at 538, 57 S.Ct. 592. As in Porter,the Court recognized a public interest in the enforcement of a federal administrative scheme, explaining that Congress had made a "declaration of public interest and policy which should be persuasive in inducing courts to give relief." 300 U.S., at 552, 57 S.Ct. 670.
This case, by contrast, involves the inherent authority of sovereign States to regulate the use of water. The States' "power to control navigation, fishing, and other public uses of water" is not a function of a federal regulatory program; it "is an essential attribute of [state] sovereignty."
*1067 Tarrant Regional Water Dist., 569 U.S., at ----, 133 S.Ct., at 2132(internal quotation marks omitted). Thus, when the Court resolves an interstate water dispute, it deals not with public policies created by federal statutes, but pre-existing sovereign rights, allocated according to the mutual agreement of the parties with the consent of Congress. Although the consent of Congress makes statutes of compacts, our flexibility in overseeing a federal statute that pertains to the exercise of these sovereign powers is not the same as the flexibility Porterclaimed for courts engaged in supervising the administration of a federal regulatory program. Authority over water is a core attribute of state sovereignty, and "[f]ederal courts should pause before using their inherent equitable powers to intrude into the proper sphere of the States." Missouri v. Jenkins,515 U.S. 70, 131, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995)(THOMAS, J., concurring).
Moreover, even if the involvement of "public interests" might augment the Court's equitable powers in the context of disputes involving regulated parties and their regulators, it does not have the same effect in a dispute between States. States-unlike common carriers and landlords-"possess sovereignty concurrent with that of the Federal Government." Gregory v. Ashcroft,501 U.S. 452, 457, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)(internal quotation marks omitted). States thus come before this Court as sovereigns, seeking our assistance in resolving disputes "of such seriousness that it would [otherwise] amount to a casus belli." Nebraska v. Wyoming,515 U.S. 1, 8, 115 S.Ct. 1933, 132 L.Ed.2d 1 (1995)(internal quotation marks omitted). The Federalist Papers emphasized that this Court's role in resolving interstate disputes "[would] not change the principle" of state sovereignty, and they gave assurances that the Court would take "all the usual and most effectual precautions" necessary for impartial and principled adjudication. The Federalist No. 39, pp. 245-246 (C. Rossiter ed. 1961) (J. Madison).
For that reason, when the parties before this Court are States, the Court should be more circumspect in its use of equitable remedies, not less. We have explained, for example, that "[w]e are especially reluctant to read absent terms into an interstate compact given the federalism and separation-of-powers concerns that would arise were we to rewrite an agreement among sovereign States, to which the political branches consented." Alabama,560 U.S., at 352, 130 S.Ct. 2295. The use of unbounded equitable power against States similarly threatens "to violate principles of state sovereignty and of the separation of powers," Jenkins,515 U.S., at 130, 115 S.Ct. 2038(THOMAS, J., concurring). In controversies among States, the Court should therefore "exercise the power to impose equitable remedies only sparingly, subject to clear rules guiding its use." Id., at 131, 115 S.Ct. 2038.
II
Applying ordinary contract principles, I would reject the Special Master's recommendation to order disgorgement of Nebraska's profits for breach of a compact. That remedy is not available for a nondeliberate breach of a contract. And even if it were, such an award must be based on Nebraska's profits, not the arbitrary number the Master selected.
A
1
Although our precedents have not foreclosed disgorgement of profits as a remedy for breach of a water compact, they have suggested that disgorgement would be available, if at all, only for the most culpable breaches: those that are "deliberate."
*1068 Texas III,482 U.S., at 132, 107 S.Ct. 2279. The traditional remedy for breach of a water compact has been performance through delivery of water. See Kansas v. Colorado,533 U.S. 1, 23, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001)(O'Connor, J., concurring in part and dissenting in part). Although we deviated from that traditional remedy in Texas III,when we authorized money damages, 482 U.S., at 132, 107 S.Ct. 2279, the majority cites no case in which we have ever awarded disgorgement. The lone reference to that remedy in our precedents is dictum in Texas IIIasserting that the money damages award in that case would not encourage efficient breaches of water compacts "in light of the authority to order ... whatever additional sanction might be thought necessary for deliberate failure to perform...." Ibid.
The lack of support for disgorgement in our compact cases comports with the general law of remedies. The usual remedy for breach of a contract is damages based on the injured party's "actual loss caused by the breach." Restatement (Second) of Contracts § 347, Comment e,p. 116 (1979). Disgorgement, by contrast, is an extraordinary remedy that goes beyond a plaintiff's damages, requiring the breaching party to refund additional profits gained in the breach. See 3 D. Dobbs, Law of Remedies § 12.7(3), pp. 166-167 (2d ed. 1993). In American law, disgorgement of profits is not generally an available remedy for breach of contract.Id.,§ 12.7(4), at 171.
Even if Texas IIIsupported a narrow exception for cases involving deliberate breach of a water compact, that exception would not apply here. Although it is uncontested that Nebraska breached the Compact and that Kansas lost $3.7 million as a result, ante,at 1053 - 1054, the Master expressly found that there is no evidence that Nebraska deliberately breached the Compact. Report of Special Master 111, 130 (Report). In fact, Nebraska's efforts "were earnest and substantial enough to preclude a finding that this was a consciously opportunistic breach." Id.,at 131. And although the majority adopts the finding that Nebraska "knowingly failed" to comply with the Compact, ante,at 1055 (internal quotation marks omitted), a finding that I do not dispute, neither the parties nor the majority disagrees with the Master's conclusion that Nebraska did not intentionally or deliberately breach the Compact, ante,at 1053 - 1056. Under such circumstances, disgorgement is not an available remedy.
2
The Special Master nevertheless recommended disgorgement because Nebraska "knowingly exposed Kansas to a substantial risk" of noncompliance. Report 130. He rested this recommendation on the Restatement (Third) of Restitution and Unjust Enrichment § 39 (2010). See Report 130-134. That section proposes awarding disgorgement when a party's profits from its breach are greater than the loss to the other party. The remedy is thought necessary because one party may "exploit the shortcomings" of traditional damages remedies by breaching contracts when its expected profits exceed the damages it would be required to pay to the other party. Restatement (Third) of Restitution § 39, Comment b,at 649. In other words, the remedy "condemns a form of conscious advantage-taking" and seeks to thwart an "opportunistic calculation" that breaching is better than performing. Ibid.
This Court, however, has never before relied on § 39nor adopted its proposed theory of disgorgement. And for good reason: It lacks support in the law. One reviewer of § 39has described it as a "novel extension" of restitution principles that "will alter the doctrinal landscape of contract law." Roberts, *1069 Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages, 42 Loyola (LA) L. Rev. 131, 134 (2008). And few courts have ever relied on § 39. The sheer novelty of this proposed remedy counsels against applying it here.
In any event, § 39opines that disgorgement should be available only when a party deliberatelybreaches a contract. This makes sense. If disgorgement is an antidote for "efficient breach," then it need only be administered when "conscious advantage-taking" and "opportunistic calculation" are present. But as noted above, the Master expressly found that no deliberate breach occurred. Report 130. The Master's reliance on § 39was accordingly misplaced.
3
Perhaps recognizing the weakness in the Master's recommendation, the majority takes a different approach, fashioning a new remedy of disgorgement for reckless breach. According to the majority, Nebraska's conduct was essentially reckless, ante,at 1056, and the Court may order disgorgement "when a State has demonstrated reckless disregard" for another State's contractual rights, ante,at 1057. As with the Restatement's proposed theory, there is no basis for that proposition in our cases.
Because disgorgement is available, if at all, only in cases of deliberatebreach, the majority asserts that, "[i]n some areas of the law," the line between intent and reckless disregard "makes no difference." Ante,at 1056. Accepting the truth of that proposition in some circumstances, the majority's caveat acknowledges that it is not true in others. Indeed, the law often places significant weight on the distinction between intentional and reckless conduct. See, e.g., Kawaauhau v. Geiger,523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)(discussing " 'willful,' " "deliberate," and "intentional" conduct, and distinguishing those terms from "reckless" conduct); see also Global-Tech Appliances, Inc. v. SEB S.A.,563 U.S. ----, ---- - ----, 131 S.Ct. 2060, 2070-2071, 179 L.Ed.2d 1167 (2011)(distinguishing "willful blindness" from "recklessness").
The majority provides scant support for its conclusion that breach of an interstate water compact is an area in which the line between intent and recklessness is practically irrelevant. It first relies on Bullock v. BankChampaign, N.A.,569 U.S. ----, ----, 133 S.Ct. 1754, 1757, 185 L.Ed.2d 922 (2013), in which the Court determined the mental state necessary for " 'defalcation while acting in a fiduciary capacity,' " as used in the Bankruptcy Code. Ante,at 1056 - 1057. In the absence of a fiduciary relationship, however, Bullockhas little relevance. Cf. Harris Trust and Sav. Bank v. Salomon Smith Barney Inc.,530 U.S. 238, 250, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000)(noting the special disgorgement rules that apply "when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person").
The majority next relies on Ernst & Ernst v. Hochfelder,425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), which addressed "scienter" under § 10(b) of the Securities Act of 1933. Ante,at 1056 - 1057 (citing 425 U.S., at 193-194, n. 12, 96 S.Ct. 1375). The Court noted that it used the term "scienter" to mean "intent to deceive, manipulate, or defraud." Id.,at 194, n. 12, 96 S.Ct. 1375. It then asserted-in dictum and without support-that recklessness is considered to be a form of intentional conduct in some areas of the law, but it declined to address whether reckless conduct could be sufficient for § 10(b) liability. Ibid.That dictum is hardly sufficient grounds for claiming that recklessness and intent are equivalent *1070 mental states in compact disputes between States.
If anything, the reverse is true. Disgorgement is strong medicine, and as with other forms of equitable power, we should impose it against the States "only sparingly." Jenkins,515 U.S., at 131, 115 S.Ct. 2038(THOMAS, J., concurring). The majority insists that the justification for disgorgement is enhanced "when one State gambles with another State's rights to a scarce natural resource." Ante,at 1057. But the way this Court has always discouraged gambling with this scarce resource is to require delivery of water, not money. Prior to 1987, "we had never even suggested that monetary damages could be recovered from a State as a remedy for its violation of an interstate compact apportioning the flow of an interstate stream." Kansas v. Colorado,533 U.S., at 23, 121 S.Ct. 2023(O'Connor, J., concurring in part and dissenting in part). If a State's right to the "scarce natural resource" of water is the problem, then perhaps the Court ought to follow its usual practice of ordering specific performance rather than improvising a new remedy of "reckless disgorgement."
B
The majority compounds its errors by authorizing an arbitrary amount of disgorgement. As explained above, the measure of the disgorgement award should be the profits derived from a deliberate breach. Yet the Special Master acknowledged that its $1.8 million award was not based on any measure of Nebraska's profits from breaching the Compact. Report 179-180. The Master gave no dollar estimate of Nebraska's profits and said only that its gain was "very much larger than Kansas' loss" of $3.7 million, "likely by more than several multiples." Id.,at 178. Despite producing no estimate more precise than "very much larger," the Master ordered a disgorgement award of $1.8 million. Id.,at 178-179.
The majority explains that "we cannot be sure why the Master selected the exact number he did." Ante,at 1059. Indeed. Neither the majority nor the Special Master nor I can identify a justifiable basis for this amount. It appears that $1.8 million just feels like not too much, but not too little.
We should hold ourselves to a higher standard. In other contexts, we have demanded that district courts "provide proper justification" for a monetary award rather than divining an amount that appears to be "essentially arbitrary." Perdue v. Kenny A.,559 U.S. 542, 557, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010). We should do the same ourselves if we are going to award disgorgement here. As with ordinary damages, disgorgement should not be awarded "beyond an amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of Contracts § 352. And a disgorgement award ought to be calculated based on something more than the Special Master's intuitions.
The majority claims that the Master "took into account the appropriate considerations," including "Nebraska's incentives, past behavior, and more recent compliance efforts" in reaching the award. Ante,at 1058 - 1059. But it makes no difference that he took those factors into account if he arrived at a number that has no articulable relationship to Nebraska's profits. Equitable disgorgement is not an arbitrary penalty designed to compel compliance, nor should it become one.
What is more, the Master considered factors beyond those relevant to the calculation of a disgorgement award. In his view, $1.8 million "moves substantially towards turning the actual recovery by Kansas, net of reasonable transaction costs, into an amount that approximates a full *1071 recovery for the harm suffered." Report 179. In other words, $1.8 million makes Kansas whole because it is a reasonable estimate of Kansas' "transaction costs"-which presumably means the State's attorney's fees and litigation costs. But, under the "American Rule," we generally do not award attorney's fees "to a prevailing party absent explicit statutory authority." Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001)(internal quotation marks omitted). And neither the majority, nor Kansas, nor the Special Master offers any support for the proposition that a disgorgement award can smuggle in an award of attorney's fees. If disgorgement were an appropriate remedy in this case, then the Court should require a calculation based on Nebraska's profits rather than Kansas' "transaction costs."
III
A
I would also reject the Master's recommendation to reform the Settlement because that recommendation conflicts with the equitable doctrine of reformation. The remedy of reformation is available to correct a contract if, "owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties."Philippine Sugar Estates Development Co. v. Government of Philippine Islands,247 U.S. 385, 389, 38 S.Ct. 513, 62 L.Ed. 1177 (1918). The well-established rule is that, when a written contract "fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement." Restatement (Second) of Contracts § 155, at 406.
Reformation is thus available only when the parties reach an agreement but then "fail to express it correctly in the writing." Id.,Comment a,at 406. If "the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the court will not reform a writing to reflect the agreement that it thinks they would have made." Id.,Comment b,at 408. Because modifying a written agreement is an extraordinary step, a party seeking reformation must prove the existence of a mutual mistake of expression by " 'clear and convincing evidence.' " Id., Comment c,at 410.
Nebraska cannot meet that burden because the States made no mistake in reducing their agreement to writing. Here are the terms the States agreed upon in their binding Settlement:
"Beneficial Consumptive Use of Imported Water Supply shall not count as Computed Beneficial Consumptive Use or Virgin Water Supply.... Determinations of Beneficial Consumptive Use from Imported Water Supply (whether determined expressly or by implication) ... shall be calculated in accordance with the [Republican River Compact Admin. (RRCA) ] Accounting Procedures and by using the RRCA Groundwater Model." Settlement § IV(F), p. 25.
The States thus agreed not to count water imported from outside the Republican River Basin. But in the very same provision, they agreed to calculate the use of imported water using the RRCA Accounting Procedures and the RRCA Groundwater Model. The terms of the Settlement are thus crystal clear: The accounting procedures control determinations of consumptive use of imported water. And the parties do not contend that they made any drafting mistake in recording the accounting procedures or the groundwater model.
*1072 Instead, the parties' mistake was their belief that the accounting procedures and water model they agreed upon would accurately exclude imported water from the calculation of Nebraska's consumptive use. They were wrong about this. In fact, under dry weather conditions, when native water flows are depleted, the water model charges Nebraska for pumping imported water. Report 32-37. The parties did not realize the magnitude of this error. To the extent they thought about it at all, they realized the water model was not perfectly precise, but assumed that only very small, immaterial amounts of imported water would make their way into the calculations. See id.,at 27. A key member of the modeling committee testified that he was "intellectually aware" of the imported-water issue, but that "we didn't believe that that was going to be a big issue." See Tr. 727 (testimony of Willem Schreüder).
There is notestimony from any source suggesting that the parties agreed to a different water model. See Report 26-27. Nebraska thus cannot meet its burden to show by clear and convincing evidence that the parties agreed to Nebraska's " '5-run formula,' " ante,at 1059, but failed to express that agreement accurately in writing.
If there is any mistake in this Settlement, it is not a mistake in writing, but in thinking. The parties knew what the methodology was and they expressly agreed to that methodology. They simply thought the methodology would work better than it did. See Tr. 727. Even though the methodology they agreed upon was imperfect, a writing may be reformed only to conform with the parties' actual agreement, not to create a better one.
The appropriate equitable remedy, if any, in these circumstances would be rescission, not reformation. In general, if there is a mutual mistake "as to a basic assumption on which the contract was made," the adversely affected party may seek to avoid the contract. Restatement (Second) of Contracts § 152, at 385; see also id.,§ 155, Comment b,Illustration 4, at 409 (noting that reformation is not available to remedy a mistake as to something other than reducing the agreement to writing). The States have not asked for rescission, of course, but it is incorrect to suggest, see ante,at 1063, that there is no other solution to this problem.
B
Realizing that ordinary reformation is not available for Nebraska, the majority again summons its equitable power and renegotiates the accounting procedures to create what it considers a fairer agreement for the States. In doing so, it announces a new doctrine of reformation: In resolving water disputes, the Court will "correct subsidiary technical agreements to promote accuracy in apportion[ment]." Ante,at 1061. From here on out, the Court will "modif[y] a technical agreement to correct material errors in the way it operates and thus align it with the compacting States' intended apportionment." Ante,at 1062.
As this case illustrates, adopting this novel remedy is a mistake. The majority fails in its attempt to conform this new doctrine of "technical agreement correction" with both principles of equity and our precedent governing compact disputes. And after creating an unjustified doctrine, the majority misapplies it.
1
To begin, the majority's reliance on equitable power is misplaced. That a court is exercising equitable power means only that it must look to established principles of equity. And reformation isthe equitable doctrine that Nebraska seeks in this case. The Court should thus follow the *1073 rules of reformation, just as it would adhere to the contours of any other equitable doctrine. Indeed, we have demanded as much from lower courts when they exercise their power to grant other forms of equitable relief, such as a permanent injunction. See eBay Inc. v. MercExchange, L.L.C.,547 U.S. 388, 392-394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). If a court fails to apply the proper standard for a permanent injunction, it is no answer to recite the obvious fact that the court acted in equity. See id., at 394, 126 S.Ct. 1837.
Putting aside the assertion of equitable power, there is no support in our precedents for the majority's doctrine of "technical agreement correction." The majority first suggests that this Court reformed a "technical document" in Texas v. New Mexico,446 U.S. 540, 100 S.Ct. 2911, 64 L.Ed.2d 485 (1980)(per curiam) (Texas I). Ante,at 1061 - 1062. But there was no reformation at issue in that case-either of the compact or an ancillary technical agreement-only the interpretation of the words in the Pecos River Compact. Texas I, supra,at 540, 100 S.Ct. 2911; see Report of Special Master on Obligation of New Mexico to Texas under the Pecos River Compact, O.T. 1975, No. 65, Orig., pp. 15-16, 34-37 (filed Oct. 15, 1979) (purporting to interpret the compact).
The majority also claims that in Kansas v. Colorado,543 U.S. 86, 125 S.Ct. 526, 160 L.Ed.2d 418 (2004), we "approved the Master's alteration of the parties' agreement...." Ante,at 1062. But nothing in Kansas v. Coloradosupports revising the express terms of a settlement agreement. In that case, the Court adopted a Special Master's recommendation to calculate water usage based on a 10-year average rather than a single year. 543 U.S., at 99-100, 125 S.Ct. 526. There is no suggestion in the Court's opinion (nor in the briefs filed in that case) that the States had previously agreed to use a 1-year method for calculating water usage or that anyone thought "reformation" of the compact or any ancillary agreement was needed. To the contrary, the Court explained that the compact simply did "not define the length of time over which" the States must make the relevant measurements. Id.,at 100, 125 S.Ct. 526. There was thus nothing to rewrite, nothing to reform. The majority suggests that the States in that case had " 'agreed to the use of annual measurement' " for calculating future water usage, ante,at 1061 - 1062 (quoting Kansas v. Colorado, supra,at 102, 125 S.Ct. 526), but the quoted passage refers to the unrelated fact that the States had, earlier in the litigation, "agreed to the use of annual measurement for purposes of calculating pastdamages," not future water usage, 543 U.S.,at 102, 125 S.Ct. 526(emphasis added). That litigation stipulation did not apply to the calculation of future water usage or future damages. Ibid.Even if the majority were correct that a damages calculation is simply the flip side of a water usage calculation, ante, at 1062, n. 10, that conclusion plainly would apply only to calculation of past water usage. It is thus no surprise that the Court held that any pre-existing damages agreements did not govern the method of measuring future compliance. Kansas v. Colorado, supra,at 103, 125 S.Ct. 526. Given that the Court plainly did not apply any such agreements, it cannot be said to have altered them.
2
Having improperly invented the doctrine of "technical agreement correction," the majority proceeds to misapply it. In "correcting" the accounting procedures, the majority purports to align them with the intent of the compacting parties. Ante, at 1061 - 1062. But we know that the majority's reformed contract does not match the "States' intended apportionment."
*1074 Ante,at 1062. We know this because the Settlement expressly states that, for purposes of apportioning the flow, imported water use would be calculated using the agreed-upon "Accounting Procedures" and the "Groundwater Model." Settlement § IV(F), at 25. The States never intended to adopt the 5-run formula, and the Court has simply picked a winner and adopted Nebraska's 5-run proposal, notwithstanding a binding agreement to the contrary.
The majority also misapplies its "correction" remedy in claiming that its fix will prevent the existing accounting procedures from "affirmatively violat[ing] the Compact." Ante,at 1062. I cannot see how this is true. First, the existing procedures do not violate the Compact. We should favor an interpretation of the Compact that would render its performance possible, rather than "impossible or meaningless." 2 S. Williston, Law of Contracts § 620, p. 1202 (1920). Read in light of this principle, the phrase "Virgin Water Supply" must be interpreted to allow for some imperfection in the groundwater models. After all, groundwater models are approximations of the physical world. Tr. 722-726. No accounting procedure can plausibly track every drop of water through the 24,900 square mile Basin. Id.,at 724.
Second, even if the existing accounting procedures would violate the Compact because they allocate some imported water, the majority's "correction" will not solve the problem. Because water models are always approximations, even the 5-run formula will be imprecise and will therefore violate the Compact if it is read to require the States accurately to account for every drop of imported water.
* * *
Claiming to draw from a vast reservoir of equitable power, the Court ignores the limits of its role in resolving water-compact disputes between States. And in the name of protecting downstream States from their upstream neighbors, it diminishes the sovereign status of each of them.
We owe the parties better. I would apply the same principles of contract law that we have previously applied to water disputes between States. Under those principles, I would sustain Nebraska's and Colorado's exceptions to the Master's recommendation to order $1.8 million in disgorgement, and overrule Kansas' exception to that recommendation. I would also sustain Kansas' exception to the Master's recommendation to reform the Settlement.
I agree only with the Court's decisions to overrule Nebraska's exception to the Master's finding that it knowingly failed to comply with the Compact, and Kansas' exception to the Master's recommendation not to issue an injunction requiring Nebraska to comply with the Compact.